IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01135-PAB-KMT

GEORGE FRANCIS OSEI,

     Plaintiff,

v.

JAMES BROOKS,
DAVID NGUYEN, and
T. TOBIN,

     Defendants.

---

**ORDER**

---

This matter is before the Court on the motions for summary judgment [Docket Nos. 66, 67] filed by defendants James Brooks, David Nguyen, and T. Tobin as well as the Motions for Limited Discovery [Docket Nos. 90, 124], the Appeal of the Magistrate Judge's Order [Docket No. 116], and the Motion to File a Surreply [Docket No. 135] filed by plaintiff George Francis Osei.

**I. BACKGROUND**[1]

---

[1]The following facts, unless otherwise indicated, are not in dispute. Mr. Osei has not responded to defendants' motion for summary judgment [Docket No. 66] despite an Order for him to do so [Docket No. 80]. Instead, plaintiff filed a Motion for Limited Discovery [Docket No. 90] pursuant to Fed. R. Civ. P. 56(d). Because no rule provides for "the tolling of time to respond to a motion for summary judgment based on a request made pursuant to [Rule 56(d)]," *see Rogers v. Sisto*, 2008 WL 3932360, at *4 (E.D. Cal. Aug. 26, 2008), the Court will consider defendants' motion for summary judgment in the absence of a response.

This case arises out of Mr. Osei's detention in a temporary holding cell at Denver International Airport ("DIA").  In the fall of 2008, Mr. Osei went to the Republic of Ghana in order to sell one of his businesses.  Docket No. 122-2 at 2, ¶ 2.  Although Mr. Osei was on probation in a criminal case in El Paso County, Colorado, the court docket reflects that the court gave him permission to travel to Ghana to obtain money for restitution.  *See* Docket No. 66-2 at 2.  Mr. Osei claims that the sale of his business took longer than expected which caused him to extend his trip.  Docket No. 122-2 at 2, ¶ 2.  While in Ghana, Mr. Osei failed to appear for a February 23, 2009 hearing for revocation of probation and a warrant issued for his arrest.  Docket No. 66-2 at 2.  Mr. Osei claims that he contacted his probation officer, who advised him to surrender to law enforcement officials upon his return to the United States.  Docket No. 122-2 at 2, ¶ 2.

On April 5, 2009, Mr. Osei arrived at DIA after his flight from Ghana.  Docket No. 28 at 4, ¶ 14.  Mr. Osei surrendered to immigration officials after landing at DIA, who then turned him over to officers of the Denver Police Department.  Docket No. 122-3 at 2.  On the date of his arrival at DIA, Mr. Osei had outstanding warrants for his arrest.[2]  *Id*.  The police officers held Mr. Osei in a temporary holding cell at DIA pending his

---

[2]On November 3, 2008, a warrant issued for Mr. Osei's arrest for failure to appear at a pretrial conference stemming from an August 3, 2008 charge of driving under restraint in violation of Colo. Rev. Stat. § 42-2-138.  Docket No. 66-4 at 2.  On that same date, a second warrant issued for Mr. Osei's arrest for failure to appear at a pretrial conference stemming from an August 7, 2008 charge for driving under restraint in violation of Colo. Rev. Stat. § 42-2-138.  Docket No. 66-5.  On February 23, 2009, a third warrant issued for Mr. Osei's arrest for failure to appear at a hearing for revocation of probation on a charge of assault.  Docket No. 66-2.  That same day, a fourth warrant was issued for Mr. Osei's arrest for failure to appear at a pretrial conference on a charge of domestic violence.  Docket No. 66-3.  However, defendants do not allege that the police officers were aware of the nature of these warrants when they took Mr. Osei into custody.

transfer to another location.  Mr. Osei testified that he had some alcoholic beverages on the flight from Ghana to help him sleep.  Docket No. 122-2 at 2, ¶ 3.

Mr. Osei's confinement at DIA lasted approximately one hour and was recorded on a video camera located in the cell, which recording defendants have submitted for the Court's consideration.  *See* Docket No. 66-1.  Mr. Osei also provided a transcript of the videotape whose accuracy defendants do not challenge.  *See* Docket No. 122-1. The undisputed evidence, viewed in a light most favorable to Mr. Osei,[3] establishes the following:

Mr. Osei was yelling obscenities at the police officers when he first entered the holding cell.  *See* Docket No. 66-1 at (00:00:14-00:00:20)[4]; Docket No. 122-1 (Tr. at 3 ll. 9-11, ll. 15-18).  Once the police officers left the cell, Mr. Osei approached the cell door and continued yelling profanities.  Docket No. 66-1 at (00:00:25-00:00:32).  As a result of Mr. Osei's behavior, the police officers re-entered the cell and handcuffed him to a metal bench in the holding cell.  While the police officers handcuffed Mr. Osei to the bench, he spat on one of the police officers.[5]  *Id.* (00:00:54); *see also* Docket No. 122-3

---

[3]While a court considering a summary judgment motion based on qualified immunity "usually" must adopt "the plaintiff's version of the facts," the Court is not required to do so when there is clear contrary video evidence of the incident at issue. *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  Thus, where the video is clear, the Court will rely primarily on the events as captured by the video.  However, where the events captured by the video are uncertain, the Court will view those events on the videotape and the other undisputed evidence in the light most favorable to Mr. Osei.  *Id.*

[4]The Court's timestamp citations reflect the time index on the surveillance video conventionally submitted by defendants.  *See* Docket No. 66-1.

[5]Mr. Osei claims that he spat in the police officers' direction because he attempted to show them that he was thirsty.  Docket No. 122-2 at 3, ¶ 11.  However, at

3

at 3 ("[Mr] Osei turn[ed] his head to the right and spit at Officer Brooks hitting him in the right arm").  In response, the police officers told Mr. Osei that his actions were being recorded and left the cell.

Soon after the officers left, Mr. Osei kicked the cell door with his right foot, Docket No. 66-1 at (00:01:38), at which point the "bald"[6] police officer reentered the cell and told Mr. Osei that he would handcuff Mr. Osei's leg to the bench if he continued his disruptive behavior.  *Id*. at (00:01:53).  The bald police officer told Mr. Osei that he would shackle his feet to one end of the bench and shackle his hands to the other side of the bench and "stretch [Mr. Osei] out."  *Id*. at (00:02:18-00:02:34); Docket No. 122-1 (Tr. at 5 ll. 7-8).  The bald police officer then told Mr. Osei that, if he "kicked th[e] door one more" time, Mr. Osei would be "uncomfortable."  Docket No. 122-1 (Tr. at 5 l. 22).  After making these comments, the bald police officer tried to handcuff Mr. Osei's right leg to the bench.  Docket No. 66-1 (00:02:54-00:03:10).  Mr. Osei yelled in pain and told the bald police officer that he had a preexisting injury to his right leg.  *Id*. at (00:03:27 – 00:03:45).  The bald police officer apologized to Mr. Osei and ultimately left Mr. Osei's right leg uncuffed.  However, the bald police officer immediately said, "you know what, you're going to be here all day," and told Mr. Osei, "kick [the door] one more time and see what happens."  Docket No. 122-1 (Tr. at 6 ll. 19 -24).

---

this point in the video, Mr. Osei had not requested water from any of the officers.

[6]Mr. Osei uses this designation in his affidavit because he does not know the identity of the police officer on the videotape.  *See* Docket No. 122-2 at 4, ¶ 14.  The Court will also use this designation since neither side has identified this officer.

Less than a minute later, Mr. Osei again kicked the cell door with his right leg. Docket No. 66-1 at (00:04:32).  In response to this kick, the bald police officer moved Mr. Osei away from the cell door to the other end of the bench.  *Id*. at (00:04:42 – 00:05:14).  Mr. Osei then kicked the bench for approximately fifteen minutes with both his right and left legs.  *Id*. at (00:14:12-00:32:14).  Mr. Osei claims that he began kicking the bench because defendants refused to give him drinking water.  Docket No. 122-2 at 5, ¶ 23.  During the fifteen minutes Mr. Osei was kicking the bench, he made several requests for water, Docket No. 122-1 (Tr. at 8 ll. 19-23), said that he had a bad shoulder, *id*. (Tr. at 8 ll. 8-11), and said that his hand was swelling.  *Id*. (Tr. at 8 l. 18).  As a result of Mr. Osei's continuous kicks, a portion of the bench collapsed.  Docket No. 66-1 at (00:27:23-00:27:40).

Mr. Osei later stood up and, using his foot, began pushing down the handle of the toilet in the cell.  *Id*. at (00:35:55).  By holding down the handle, he eventually caused it to overflow and spill water onto the cell floor.  *Id*. at (00:36:00-00:36:15). Once the toilet overflowed, two police officers entered the cell to reposition Mr. Osei away from the toilet.  *Id*. at (00:36:38).  As the police officers tried to handcuff Mr. Osei to the other side of the bench, Mr. Osei lunged forward while struggling against the officers' attempts to handcuff him.  *Id*. at (00:36:50-00:36:56).  A third police officer entered the holding cell to assist the other officers gain control of Mr. Osei.  The three officers positioned themselves on top of Mr. Osei with one of the officers placing his knees on Mr. Osei's back to control him.  *Id*. (00:36:56-00:37:15).  Once the officers secured Mr. Osei, Mr. Osei apologized to the officers.  Docket No. 122-1 (Tr. at 15 ll.

17-18).  The police officers then laid Mr. Osei down on the bench with his left leg cuffed to the bench.  Docket No. 66-1 at (00:37:15-00:37:21).  The front of his clothes appeared to be wet.  Mr. Osei remained in this position for approximately twenty minutes until deputies from the Denver Sheriff's Department arrived to take him to another location.  Docket No. 122-2 at 6, ¶ 34.  While Mr. Osei was on the bench with his left leg cuffed to the bench awaiting transfer, he made repeated requests for the police officers to reposition his body because he had a "bad leg."  *See* Docket No. 122-1 at 16-17.

As a result of these events, Mr. Osei filed this case pursuant to 42 U.S.C. § 1983 claiming that defendants violated his Fourth and Fourteenth Amendment rights.  Docket No. 28 at 1-2.  In his second amended complaint, Mr. Osei brought five claims for relief against defendants: (1) for deprivation of basic living necessities (drinking water); (2) procedural and substantive due process violations as a result of the loss of his property; (3) unnecessary and excessive use of force (one claim of excessive force based on the toilet water incident and one claim of excessive force because of unduly tight handcuffs); (4) failure to intervene; and (5) unconstitutional policies by the City and County of Denver in violation of *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).  *See* Docket No. 28 at 7-13.  On March 30, 2012, the Court accepted the Recommendation of United States Magistrate [Docket No. 59] and dismissed Mr. Osei's first claim (deprivation of basic living necessities), second claim (procedural and substantive due process), and fifth claim (*Monell* claim against the City and County of Denver).  *See* Docket No. 64.  The Court denied the motion to dismiss as to the toilet water allegations in the third claim since there were genuine issues of disputed fact and

6

also accepted the Recommendation to deny the dismissal of that portion of the third claim involving the handcuffs as well as the fourth claim for failure to intervene.

On April 3, 2012, defendants filed a motion for summary judgment [Docket No. 66] requesting that the Court enter judgment against plaintiff on his claim of excessive force based on the toilet water incident.  On that same day, defendants filed a motion for summary judgment [Docket No. 67] requesting that the Court enter judgment against Mr. Osei on his claims of excessively tight handcuffs and failure to intervene.  The Court addresses these motions in turn.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).

Defendants claim that they are entitled to qualified immunity on all of Mr. Osei's claims.  Qualified immunity shields government officials from money damages unless a

plaintiff shows that (1) the official violated a constitutional right and (2) the right was "clearly established" at the time of the challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In contrast to a standard motion for summary judgment – which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial – a motion based on a claim of qualified immunity imposes the burden on Mr. Osei to show "both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013) (citation omitted); *Ashcroft v. al-Kidd*, --- U.S. ----, 131 S.Ct. 2074, 2080 (2011).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that district courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *Id*. at 236. Accordingly, the Court will begin by determining whether Mr. Osei has established that defendants violated his constitutional rights.

**III.  ANALYSIS**

**A.  Fourth and Fourteenth Amendments**

The parties disagree as to whether the Fourth Amendment or the Fourteenth Amendment applies to Mr. Osei's allegations of excessive force in his third claim. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court stated that, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id*. at 394. The Supreme Court noted that the Fourth Amendment applies to excessive force arising out of a "seizure," the due process clause of the

Fourteenth Amendment protects pretrial detainees from excessive force, and the Eighth Amendment serves as the primary source of protection for convicted prisoners. *Id*. at 395 n. 10.  However, the Supreme Court left open the question of "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id*.  Consequently, some courts have described there being a "legal twilight zone" between the end of an arrest and the beginning of pretrial detention.  *See Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000).

A circuit split has developed since *Graham* as to which Amendment, the Fourth or Fourteenth, applies to claims brought by individuals arrested without a warrant who were subject to the use of force by state actors before their first appearance in front of a judicial officer.[7]  *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010) (citing cases).

---

[7]The Second, Third, Sixth, Eighth, Ninth, and Tenth Circuits have each adopted a variant of the continuing-seizure rule whereby the Fourth Amendment applies until an individual arrested without a warrant appears before a neutral magistrate for arraignment, a probable cause hearing, or until the arrestee leaves the joint or sole custody of the arresting officers.  *See, e.g., Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) (holding that the Fourth Amendment protects against use of force while the arrestee is in the arresting officer's custody until arraignment or formal charge)*; United States v. Johnstone*, 107 F.3d 200, 206-07 (3d Cir. 1997) (declining to define where an arrest ends and pretrial detention begins, the Third Circuit observed that "a 'seizure' can be a process, a kind of continuum, and is not necessarily a discrete moment of initial restraint"); *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010) ("the dividing line between the Fourth and Fourteenth Amendment zones of protection [is] at the probable-cause hearing."); *Chambers v. Pennnycook*, 641 F.3d 898, 905 (8th Cir. 2011) ("we have applied Fourth Amendment excessive force standards to incidents occurring during the transportation, booking, and initial detention of recently arrested persons."); *Torres v. City of Madera*, 524 F.3d 1053, 1056 (9th Cir. 2008) ("the Ninth Circuit employs a 'continuing seizure' rule, which provides that 'once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers'"); *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (a plaintiff's claims of post arrest excessive force are governed by the Fourth Amendment's objective

The disagreement among courts centers around the determination of when seizure ends – thereby signaling the end of Fourth Amendment protections – and when pretrial detention begins – signaling the beginning of Fourteenth Amendment protections. Some courts that apply the Fourth Amendment rely on practical considerations, *see* *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) (Fourth Amendment applies when the arrestee "remains in the custody (sole or joint) of the arresting officer"), while others view the distinction as a shift in an arrestee's legal status.  *See Aldini*, 609 F.3d at 865 ("which amendment applies depends on the [legal] status of plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between.") (citation omitted).[8]  By contrast, the courts that apply the Fourteenth Amendment as the operative provision have reasoned that neither the text nor the "core concerns" of the

---

reasonableness standard until he or she is brought before a judicial officer for a determination of probable cause), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995).  By contrast, the Fourth, Fifth, Seventh, and Eleventh Circuits have rejected the continuing-seizure rule by holding that seizure ends at arrest.  *See, e.g., Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (en banc) (seizure ends at arrest) *overruled on other grounds by Wilkins v. Gaddy,* --- U.S. ----, 130 S.Ct. 1175 (2010); *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993) (refusing to apply the continuing-seizure rule)*; Wilkins v. May*, 872 F.2d 190, 192-94 (7th Cir. 1989) (because there is no limiting principle for the reach of the Fourth Amendment, the Fourteenth Amendment should apply after the point of seizure); *Hicks v. Moore*, 422 F.3d 1246, 1254 (11th Cir. 2005) (noting that the "precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit").

[8]Courts that rely on the arrestee's legal status derive their reasoning from *Bell v. Wolfish*, 441 U.S. 520 (1979).  In *Bell*, the Supreme Court defined a "pretrial detainee" as someone who has had a "judicial determination of probable cause as a prerequisite" for extended detention.  *Id*. at 536.  Therefore, these courts reason that someone who has not had a probable cause hearing is not a "pretrial detainee" whose claims are analyzed under a due process standard.  *See Aldini*, 609 F.3d at 866.

Fourth Amendment apply to custodial treatment. *See, e.g., Wilkins v. May*, 872 F.2d 190, 192-94 (7th Cir. 1989) ("[a] natural although not inevitable interpretation of the word 'seizure' would limit it to the initial act of seizing"); *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993) (the Fourth Amendment body of law is directed at the "*initial act of restraining an individual's liberty*" and not condition occurring after seizure) (emphasis in original).

The Tenth Circuit has adopted a variant of the continuing-seizure rule whereby the Fourth Amendment governs claims by an arrestee challenging the use of force by state actors after a warrantless arrest, but before a probable cause hearing in front of a judicial official. *See Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (claims of post arrest excessive force are governed by the Fourth Amendment's objective reasonableness standard until an arrestee is brought before a judicial officer for a determination of probable cause to arrest) *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995); *accord Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 866 (10th Cir. 1997) (noting that *Austin* was "based on alleged intentional physical assaults by police, occurring while a person, who was arrested without warrant, was being detained and before presentment to a magistrate judge."); *see also Frohmader v. Wayne*, 958 F.2d 1024, 1026 (10th Cir. 1992) (noting that *Austin* held that "claims of post-arrest excessive force by arrestees like Frohmader, who are detained without a warrant," are governed by the Fourth Amendment). In this case, however, because plaintiff had at least one outstanding warrant and surrendered to police officers, the leading Tenth Circuit cases are not directly on point.

Although it is generally appropriate to establish which constitutional amendment applies before reaching the merits of a case, *see Porro v. Barnes,* 624 F.3d 1322, 1325 (10th Cir. 2010) (noting that the determination of the applicable constitutional provision is important because the burden a plaintiff must meet is substantially different under the Fourth and Fourteenth Amendment), the Court need not decide which Amendment applies to defendants' use of force in this case.  Because use of force that violates the Fourteenth Amendment necessarily violates the Fourth Amendment, *see Aldini*, 609 F.3d at 860, if Mr. Osei can establish that defendants' use of force violated his Fourteenth Amendment rights, then the remaining inquiry will be whether the law surrounding Mr. Osei's claims was clearly established.  *See Austin*, 945 F.2d at 1158 (upholding district court ruling that defendants' use of force violated both the Fourteenth Amendment and the Fourth Amendment without deciding which applies).  Similarly, if Mr. Osei fails to establish that defendants' use of force violated the Fourth Amendment, it necessarily follows that Mr. Osei cannot prove this same use of force violated the Fourteenth Amendment.  *See Frohmader*, 958 F.2d at 1027 ("The due process standard is more onerous than the Fourth Amendment reasonableness standard").  With these principles in mind, the Court addresses Mr. Osei's claims.

### B.   Toilet Water Incident

Mr. Osei argues that defendants used excessive force when they took him to the cell floor after he caused the toilet to overflow.  Docket No. 122-2 at 5, ¶¶ 27-29.  Despite allegations that may suggest that his head was forced into the toilet, *see id*. at ¶ 28 (police officers "submerged" his head in water); *id*. at ¶ 29 (Mr. Osei "felt that [he]

could not breath [sic]"); *id.* ("toilet water seeped into [Mr. Osei's] mouth."); *see also* Docket No. 122 at 11 ("[d]efendants dunked [Mr. Osei's] head into toilet water"), the videotape shows that the only time Mr. Osei's face may have come into contact with the toilet water was when the officers restrained him on the cell floor after the toilet overflowed.  Docket No. 28 at 6, ¶ 35 and 11, ¶ 65; Docket No. 42 at 16-17, ¶¶ 32-33.

Excessive force claims under the Fourth Amendment are governed by the objective reasonableness standard.  *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).  Under this standard, the "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.  In determining whether the use of force is reasonable in a particular situation, courts consider (1) the severity of the crime at issue, (2) whether the plaintiff posed an immediate threat to the safety of the officers, and (3) whether the plaintiff actively resisted or attempted to flee.  *Id.* at 396.  The reasonableness of a police officer's particular use of force is usually viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  Thus, the excessive force inquiry evaluates the force used in a given detention against the force reasonably necessary to effect detention under the circumstances of the case.  *Cortez v. McCauley,* 478 F.3d 1108, 1126 (10th Cir. 2007).

With respect to the toilet water incident claim, the first *Graham* factor weighs in favor of plaintiff.  Here, whether the Court considers the fact that plaintiff turned himself in on an arrest warrant or considers what appears to be the reason the officers entered

the cell immediately beforehand, namely, that plaintiff had flooded the cell, this constituted a minor violation.  As to the second *Graham* factor, Mr. Osei did pose an immediate threat to the officers.  After Mr. Osei flooded the cell floor, the officers reasonably needed to move him away from the toilet.  They entered the cell, had Mr. Osei kneel near the toilet to unlock his handcuffs (which were fastened to the head of the bench near the toilet), and moved Mr. Osei towards the foot of the bench.  During these maneuvers, the officers did not place Mr. Osei in contact with the water on the floor.  Mr. Osei struggled with the officers as they were trying to handcuff him to the foot of the bed.  Mr. Osei pulled or lunged forward to the floor, whereupon one of the officers lost his balance.  The floor appears to be slippery based on the movements of the people in the cell at the time.  Mr. Osei and the two officers trying to handcuff him then ended up on the floor as the officers attempted to gain control of him.  A third officer then assisted the other officers.  Although Mr. Osei was in handcuffs at this time, the combination of Mr. Osei's size, the slippery cell floor, and Mr. Osei's previous aggressive behavior, made it appropriate for the officers to use force to restrain him and to do so while he was on the floor.  *See Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997) (holding that the use of an "arm bar maneuver" and "take-down" of an individual was reasonable to protect the safety of two officers in light of the individual's "strange and aggressive conduct"); *see also Graham*, 490 U.S. at 397.  Thus, the second *Graham* factor weighs in favor of the police officers.

To the extent Mr. Osei claims that his mouth and nose were completely submerged in the water on the floor and that he "felt like [he] could not breath[e]," such an assertion is belied by the video.  *See Durastanti*, 607 F.3d at 659 (noting that courts

14

do not have to accept plaintiff's facts "to the extent that there is clear contrary video evidence"). Not only does the video show that Mr. Osei was talking the entire time the police officers struggled with him, it also reveals that the water in the cell did not pool and, as a result, was not deep enough to submerge his head. *See* Docket No. 66-1 at (00:36:56-00:37:15).

With regard to the third factor, as discussed above, the video shows that Mr. Osei resisted the police officers' attempts to move him away from the toilet.[9] In addition, Mr. Osei had refused to obey the police officers' orders and commands when he kicked the door, broke the bench, and flooded the cell. Thus, his general disregard of the police officers' commands as well as his uncooperative and disruptive behavior makes the third *Graham* factor weigh in favor of the police officers.

Mr. Osei nonetheless argues that he has established that the police officers' actions were unconstitutional because one of the police officers told him that he could "drink *that* water." Docket No. 28 at 8, ¶ 50; Docket No. 122-2 at 5, ¶¶ 28-29. This argument, however, is unconvincing. Because the Fourth Amendment reasonableness inquiry in an excessive force case is an objective one, the underlying intent or motivation of the officers is irrelevant. *Graham*, 490 U.S. at 397. Moreover, under the Fourteenth Amendment, the Court finds that, in light of Mr. Osei's disruptive and destructive behavior and the fact that he had just resisted handcuffing, thus necessitating these officers having to restrain him on a floor wet with toilet water, no reasonable jury could conclude that the police officer's alleged statement that Mr. Osei

---

[9]The video shows that Mr. Osei's face made contact with the toilet water on the cell floor largely as a result of Mr. Osei's own actions.

could "drink *that* water" exhibited sufficient "malice" or "shocked the conscience" enough to establish a violation of Mr. Osei's Fourteenth Amendment right to be free from excessive force.  *See Porro*, 624 F.3d at 1326 (a substantive due process analysis for an excessive force claim analyzes whether an officer's actions were "inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience") (citation omitted).

In addition, Mr. Osei has not shown any actual injury that is not de minimis as a result of the police officer holding his head against the wet floor for fewer than ten seconds.  *See Fisher v. City of Las Cruces*, 584 F.3d 888, 898 (10th Cir. 2009) (noting that, for all excessive force claims, a plaintiff must show "actual harm" and, although he is not required to show significant injury, he must show enough proof of an injury in order to sustain his claim).  Thus, because two of the three *Graham* factors weigh in favor of defendants and Mr. Osei has shown no actual injury resulting from the toilet water incident, the Court finds that, even viewing the facts in a light most favorable to Mr. Osei, no reasonable jury could conclude that the police officers acted unreasonably when they secured Mr. Osei on the cell floor after he flooded the cell.  Because Mr. Osei cannot show that the police officers violated his constitutional rights with regard to the toilet water incident, he has not met his burden under the first prong of the qualified immunity analysis and the Court will not address the second prong of the analysis. *Pearson*, 555 U.S. at 236.  Because Mr. Osei does not meet the Fourth Amendment standard with respect to his toilet water claim, he cannot prove a violation of the Fourtheeth Amendment based on the same conduct.  *See Frohmader*, 958 F.2d at

16

1027 ("The due process standard is more onerous than the Fourth Amendment reasonableness standard").  As a result, defendants are entitled to summary judgment on Mr. Osei's claim of excessive force based on the toilet water incident.

### C.  Handcuffing Claims

Mr. Osei argues that defendants used excessive force when they: (1) used handcuffs to secure his leg instead of leg cuffs or shackles; (2) "cinched" the handcuffs on his wrists and ankles causing his "wrist and ankle [to] swell up" and cut into his skin; (3) moved him into increasingly awkward positions that increased his pain from the tight handcuffs; (4) "tugged, pulled, and twisted the handcuffs" behind him causing unnecessary pain and suffering; and (5) ignored his screams of pain and complaints of injury from the handcuffs.  Docket No. 122 at 13.[10]

Mr. Osei appears to raise a "manner" or "course" of handcuffing claim against defendants.  The Tenth Circuit has recognized that in certain situations "unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury

---

[10]In his response, Mr. Osei for the first time raises a claim against defendants for "deliberate indifference" to his health and safety for failing to loosen his handcuffs despite his many appeals for them to do so.  Docket No. 122 at 15.  Although issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint pursuant to Fed. R. Civ. P. 15, *see Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998), the Court will not do so here.  Since filing his case, Mr. Osei has already amended his complaint twice and defendants' motion to dismiss has already been resolved.  Since the resolution of the motion to dismiss, plaintiff has not attempted to file an amended complaint or otherwise indicated that he may raise another claim in this case.  Based on the fact that the purpose of Fed. R. Civ. P. 8 is to give defendants "fair notice" of the claims against them, the Court will decline to address plaintiff's argument with regard to deliberate indifference because this "late shift in theories [will] cause[] substantial prejudice to [defendants]."  *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991).

from the handcuffing and alleges than an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez*, 478 F.3d at 1129.  To establish a manner of handcuffing claim, Mr. Osei must show (1) that defendants' use of force was more than reasonably necessary, and (2) that he suffered "some actual injury" caused by defendants' use of force that is not de minimis, be it physical or emotional.  *Fisher,* 584 F.3d at 897 (citing *Cortez*, 478 F.3d at 1129 n. 25). Under this test, courts use the three *Graham* factors to determine whether a police officer's use of handcuffs was reasonable in the first instance.  *Id*.  After applying the *Graham* factors, courts analyze the injuries suffered by the plaintiff to determine whether the manner of handcuffing rendered a police officer's use of force unreasonable.  *See Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir. 2011) (noting that after using the *Graham* factors "an examination of the resulting injury supplements" the excessive force inquiry).  The Tenth Circuit created this test because police officers almost always use handcuffs and, therefore, the *Graham* factors offer little guidance in tight handcuff cases.  *Fisher*, 584 F.3d at 902 n. 1 (Gorsuch J., concurring).  Thus, a look at the extent of an injury claimed by the plaintiff fills "a small analytical void that *Graham* left open," and helps to identify when an otherwise lawful application of handcuffs constitutes force that a reasonable jury could find rises to the level of excessive force because an officer applied handcuffs too tightly.  *Id*. at 902.

In this case, Mr. Osei asserts that the manner in which defendants placed the handcuffs on his wrists and ankle caused him injuries and rose to the level of excessive

force.  Docket No. 122 at 13.  The Court addresses the arguments as to the wrists and ankle separately.

### 1.   Excessive Force in Handcuffing of the Wrists

As a threshold matter, the Court notes that Mr. Osei's excessive force claims with respect to the use of handcuffs on his wrists are unclear.  Despite the fact that Mr. Osei has access to the surveillance video, he does not identify with particularity when defendants "cinched" the handcuffs on his wrists, when they "tugged, pulled, and twisted the handcuffs up behind" his back, or when they placed him in "awkward" positions.  *See* Docket No. 122 at 13-15.  This lack of particularity undercuts the Court's ability to effectively address his arguments.

As noted above, the first *Graham* factor weighs in favor of Mr. Osei because plaintiff turned himself in on an arrest warrant and the reasons the officers handcuffed his wrists to the bench, namely, that plaintiff kicked the door, broke the bench, and flooded the cell, constitute minor violations.

With regard to the second *Graham* factor, the video shows that Mr. Osei was verbally abusive when he first entered the cell, spat at one of the police officers, Docket No. 66-1 at (00:00:54), kicked the cell door, kicked the bench until it broke, and then flooded the cell floor.  Given these actions, it was reasonable for the police officers to restrain Mr. Osei's movement by handcuffing him to various locations on the bench.  *Id*. at (00:00:25).  It was also reasonable for the officers to move Mr. Osei away from the cell door and to the other side of the bench because he refused to stop kicking the cell door.  *Id*. at (00:04:42-00:05:14).  To the extent Mr. Osei claims that, in moving him

from one side of the cell to the other, defendants placed him in "increasingly awkward positions," the Court finds that this use of force is reasonable because it occurred as a result of Mr. Osei's persistently disruptive behavior. *See Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) ("[T]he Fourth Amendment does not require police [officers] to use the least intrusive means in the course of a detention, only reasonable ones"). Finally, it was reasonable for the officers to lay Mr. Osei down on the bench because this was the only alternative left to prevent Mr. Osei from kicking the bench or flooding the cell. To the extent the police officers had to "tug[], pull[], and twist[] the handcuffs," Docket No. 122 at 13; Docket No. 122-2 at 4, ¶ 16, to lay Mr. Osei down on the bench, the Court finds that this use of force was reasonable and would not have been required had Mr. Osei not found ways to damage property and flood the cell.[11]  *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment"). Because Mr. Osei spat on, yelled obscenities at, and struggled with the

---

[11]Mr. Osei argues that the bald police officer's comments that he would "stretch [Mr. Osei] out on the metal bed," Docket No. 122-2 at 4, ¶ 14, show malice. Docket No. 122 at 14. The Court disagrees. Although the bald officer made these comments to Mr. Osei, there is no indication that he followed through with the threats. For example, the bald police officer did not cuff Mr. Osei's right leg to the bench after Mr. Osei complained of a preexisting injury. Moreover, when Mr. Osei kicked the door despite being warned not to do so, the bald police officer repositioned Mr. Osei to the other side of the cell. It was not until Mr. Osei flooded the cell and there were no reasonable options left but to handcuff Mr. Osei's leg to the bench that the police officer did so. Furthermore, the bald police officer cuffed Mr. Osei's *left* leg to the bench and not the one with the known preexisting injury. Thus, the simple fact that the bald officer made comments that can be construed as threats is insufficient to show malice, given that none of these threats came to fruition. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right use some degree of physical coercion or *threat thereof to effect it*") (emphasis added).

officers, and otherwise exhibited unusual behavior, it was reasonable for the officers to keep handcuffs on Mr. Osei's wrists for their own safety.  Thus, the second *Graham* factor weighs in favor of the police officers.

As to the third *Graham* factor, although Mr. Osei did not attempt to flee the cell, he disobeyed the orders and commands given by the police officers.  In disobeying the officers' commands, he created a dangerous situation by flooding the cell floor, breaking the cell bench, and struggling with officers when they tried to reestablish control.  Based on these facts, no reasonable jury could find that the police officers used excessive force in applying the handcuffs to Mr. Osei's wrists.

Mr. Osei argues that, even if the police officers were justified in handcuffing his wrists, they did so in a manner that caused him injuries and, therefore, constitutes excessive force.  Docket No. 122-2 at 4, ¶¶ 15-17.  Mr. Osei, however, did not notify the police officers at the time that his handcuffs were hurting his wrists.  The transcript of the video shows that Mr. Osei complained several times to the officers about his shoulder, not his wrists.  Docket No. 122-1 (Tr. at 7 ll. 24-25); *id*. (Tr. at 8 ll. 8-10); *id*. (Tr. at 12 ll. 17-18).  Mr. Osei twice stated that his "hand swelled up," *id*. (Tr. at 8 ll. 10, 18); however, these statements were not made in the presence of police officers and were stated so softly that no inference can be made that they were intended to alert the officers.  *See* Docket No. 66-1 at (00:11:00 – 00:13:45).  Moreover, there is no indication that any of the police officers heard the comments about the hand swelling or could have reasonably interpreted these comments to mean that the handcuffs were too tight.  Mr. Osei did at one point request that the police officers "take the cuff off of [his] hand."  Docket No. 122-1 (Tr. at 16 ll. 5-6).  However, Mr. Osei said this in a low

voice and did not direct the complaint to any police officer. Even if a police officer did overhear the complaint, plaintiff fails to explain why the officer would interpret it as an indication the handcuffs were too tight or would otherwise heed his request to remove the handcuffs without more of an explanation. *See, e.g., Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209 (10th Cir. 2008) (plaintiff told officers a "half dozen times" that the handcuffs were too tight and "that his wrists were hurting and going numb"); *Cortez*, 478 F.3d at 1128 (plaintiff "complained that the handcuffs were too tight" in the back of the patrol car); *Fisher*, 584 F.3d at 892 (plaintiff stating he "begged [the officer] not to handcuff me behind [his] back"). There is also no indication from the video that anything prevented Mr. Osei from telling the officers that his handcuffs were too tight. Thus, because Mr. Osei did not alert the police officers that his handcuffs were too tight, the police officers cannot be liable for ignoring his complaints. *See Silvan W. v. Briggs*, 309 F. App'x 216, 224-25 (10th Cir. 2009) (finding that plaintiff cannot maintain an excessive force claim based on his handcuffs because he never "notified the officers that his handcuffs were painful"); *Cortez*, 478 F.3d at 1129 (police officers must not "ignore[ ] a plaintiff's timely complaints"); *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010) (noting that to state a claim for unduly tight handcuffs, plaintiff must show that "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experience 'some physical injury' resulting from the handcuffing") (citation omitted).

Accordingly, because the officers acted reasonably when they handcuffed Mr. Osei's wrists and because Mr. Osei did not alert the police officers that the handcuffs

were too tight, Mr. Osei cannot maintain a claim for excessive force based on the handcuffing of his wrists.

### 2.  Excessive Force in Handcuffing of the Ankle

Mr. Osei argues that he suffered injuries as a result of defendants handcuffing his left leg to the metal bench.  Docket No. 122 at 13.  Mr. Osei claims that the police officers should have used leg shackles instead of handcuffs, *id*. at 14, and that he suffered injuries as a result of defendants' use of handcuffs on his legs.

With respect to Mr. Osei's ankle claim, the video shows that Mr. Osei's left leg was handcuffed to the bench for approximately sixteen minutes.  *See* Docket No. 60-1 at (00:38:00-00:53:45).  For substantially the same reasons discussed above, the Court finds that the initial decision by the police officers to handcuff Mr. Osei's left leg to the bench satisfies the *Graham* factors.  Mr. Osei was given four warnings that his legs would be handcuffed to the bench if he did not cease his disruptive behavior, yet Mr. Osei continued to kick the cell door and the bench, and to use his leg to flood the cell floor.  Under these circumstances, the Court finds that no reasonable jury could find that defendants' initial decision to handcuff Mr. Osei's leg to the bench constituted excessive force.  *Fisher*, 584 F.3d at 896.

Mr. Osei, however, argues that defendants unreasonably ignored his complaints that the handcuffs around his leg were causing him pain.  Mr. Osei made a request for the officers to remove the handcuff around his left leg shortly after the handcuff was placed on his leg, *see* Docket No. 122-1 (Tr. at 16 ll. 9-10 (00:38:52)), but did not make another such request until much later when two Sheriff's deputies entered the cell to

move him out. *Id.* (Tr. at 19 ll. 5-6 (00:52:47-00:52:57)).  Approximately four minutes

after the handcuff was placed around his leg, Mr. Osei stated "Please loosen this,

please" when no police officers were in the cell and at a volume that does not seem

intended to alert the officers. *Id.* (Tr. at 16 l. 22 (00:42:46)).  About ten minutes later, he

said, "My leg is swelling up so bad.  The cuffs is breaking my leg." *Id.* (Tr. at 18 ll.

18-19 (00:51:20)).  However, he stated this in a normal tone of voice and was not

directing the comment to any officer.  While he also complained repeatedly that his leg

was "not good," Mr. Osei never stated that the handcuffs were cutting into his skin.

Even the statement that his leg was swelling is not clearly a complaint about the

handcuffs being too tight since he stated to the two Sheriff's deputies at the end of the

videotape that "both legs have [a] circulation problem." *Id.* (Tr. at 19 l. 6 (52:52)).

Moreover, when those deputies entered the cell to remove him, one asked him, "How

are you doing, sir?  Are you all right?" *Id.* (Tr. at 18 l. 26 -19 l. 1 (52:41)).  Mr. Osei said

nothing about the cuffs on his leg being too tight, but rather said "I was dry" and then

stated that he has a bad leg. *Id.* (Tr. at 19 ll. 2-5 (00:52:44)).[12]  Thus, as with the

handcuffs on his wrists, Mr. Osei's failure to alert the officers that the handcuff on his

leg was too tight precludes any claim that they ignored his complaints. *See Silvan W.*,

309 F. App'x at 224-25 (finding that plaintiff cannot maintain an excessive force claim

based on his handcuffs because he never "notified the officers that his handcuffs were

painful"); *Cortez*, 478 F.3d at 1128 (finding no liability for officers because plaintiff's

---

[12]At the end of the videotape, Mr. Osei asked the deputy sheriffs to remove the handcuffs.  However, as the video shows, this request refers to the handcuffs on his wrists since the handcuff around his ankle had already been removed.  Docket No. 122-1 (Tr. at 19 ll. 22-24).

injury was de minimis although plaintiff "complained that the handcuffs were too tight" in the back of the patrol car); *Gilles v. Davis*, 427 F.3d 197, 207-08 (3d Cir. 2005) (finding that a plaintiff singing religious songs to take his mind off of the pain while in custody was insufficient to alert the officers that his handcuffs were too tight); *Fettes*, 375 F. App'x at 532-34 (finding that a constitutional requirement obligating officers to stop and investigate every utterance of discomfort and make a new judgment as to whether the handcuffs were "too tight" is not reasonable).  This conclusion also renders Mr. Osei's request for limited discovery of medical records moot.

In summary, even viewing the evidence in the light most favorable to Mr. Osei, he has not shown that a reasonable jury could find that the officers employed greater force than would have been reasonably necessary under the circumstances. Consequently, Mr. Osei has not established that defendants' use of force violated his Fourth or Fourteenth Amendment right to be free from the use of excessive force. *Fisher*, 478 F.3d at 1129.  Accordingly, defendants are entitled to qualified immunity and summary judgment on Mr. Osei's excessive force claim based on unduly tight handcuffs.

### D.   Failure to Intervene

The affirmative duty of law enforcement officials to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence is clearly established.  *Vondrak*, 535 F.3d at 1210 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  "[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be

liable under § 1983." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996). A police officer is liable for the harm caused by his fellow officers if he "observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Vondrak*, 535 F.3d at 1210. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id*. Because Mr. Osei has not established that defendants violated his constitutional rights, defendants could not have breached their duty to intervene. Accordingly, defendants are entitled to summary judgment on this claim.

### E. Rule 56(d) Affidavit

Mr. Osei filed two motions for leave to conduct discovery pursuant to Fed. R. Civ. P. 56(d). *See* Docket Nos. 90, 124. In these motions, Mr. Osei requests leave to conduct limited discovery with regard to defendants' Motions for Summary Judgment [Docket Nos. 66, 67]. Mr. Osei claims that he needs discovery to: (1) show that defendants pushed him on the floor of the cell; (2) identify which officer told him to "drink *that* water"; (3) identify which officers handcuffed him to the bed; (4) identify which officers failed to intervene; and (5) find the medical records showing what injuries, if any, he suffered. Docket No. 124-1 at 2, ¶ 5; Docket No. 90-1 at 2, ¶ 5.

A party may seek limited discovery under Rule 56(d) of the Federal Rules of Civil Procedure in order to respond to a summary judgment motion.[13] Rule 56(d) allows a

---

[13] Effective December 1, 2010, the Supreme Court amended Rule 56, and what is now Rule 56(d) previously was codified as Rule 56(f). Fed. R. Civ. P. 56 Adv. Comm. Note (2000) ("The standard for granting summary judgment remains unchanged . . . Subdivision (d) carries forward without substantial change the provisions of former

court to stay or deny a summary judgment motion in order to permit further discovery if the nonmovant states by affidavit that it lacks facts necessary to oppose the motion. *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000).  In order to be afforded relief, Mr. Osei must show (1) that necessary probable facts are not available, (2) why those facts cannot be presented currently, (3) "what steps have been taken to obtain these facts," and (4) "how additional time will enable [Mr. Osei] to" obtain those facts and rebut the motion for summary judgment. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992); *see also Price*, 232 F.3d at 783 ("Rule 56(f) does not operate automatically.  Its protections . . . can be applied only if a party satisfies certain requirements.").  To prevail on a Rule 56(d) motion, a party must specify with particularity legitimate needs for further discovery and identify which aspects of discovery require more time to complete. *Jones v. City & Cnty. of Denver*, 854 F.2d 1206, 1211 (10th Cir. 1988).  The plaintiff must also allege why the information sought would be sufficient to create a genuine issue of material fact to defeat summary judgment. *Campbell*, 962 F.2d at 1522.  Additionally, a party seeking relief under Rule 56(d) must "demonstrate a 'connection between the information he would seek in discovery and the validity of the [defendants'] qualified immunity assertion." *Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990).  Denial of a Rule 56(d) motion is proper if the additional evidence sought would not create a genuine issue of material fact to defeat summary judgment.

---

subdivision (f)").

The Court finds that additional discovery is not warranted in this case.  With regard to the toilet water incident, the Court has already found that the video and the transcript of the video, when viewed in a light most favorable to Mr. Osei, do not prove the officers used excessive force.  The name of the officers, including the name of the officer who said "drink that water," are irrelevant to whether plaintiff can overcome defendants' qualified immunity defense.  *Campbell*, 962 F.2d at 1522.  The same is true in regard to Mr. Osei's claims regarding the use of excessive force because of the handcuffs on both his wrists and ankle.

Mr. Osei alleges that he needs discovery of his medical records because he suffered "injuries that may be identified by Defendants, or in medical records, or by medical personnel who treated" him after the incident.  Docket No. 90-1 at 2.  Mr. Osei alleges that he contacted Denver Health Medical Center and University Hospital, who have both explained that they do not have his records.  Docket No. 109-1 at 2, ¶ 3.  Even assuming this is true, Mr. Osei believes that the deputy sheriffs are most likely to have observed his alleged injuries and therefore the Sheriff's Department is in possession of relevant medical information.  Docket No. 124 at 5.  However, the named defendants are not members of the Denver Sheriff's Department and the City and County of Denver is no longer a defendant in this case.  The Court dismissed Mr. Osei's claims against the City in its previous Order.  *See* Docket No. 64.  Thus, the remaining defendants would not have access to any medical records in the possession of the Sheriff's Department.  Accordingly, Mr. Osei's requests for discovery are denied.

## F.   Appeal of Stay of Discovery

District courts review magistrate judges' Orders regarding non-dispositive motions under a "clearly erroneous or contrary to law" standard.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).  Under this standard of review, a magistrate judge's finding should not be rejected merely because the Court would have decided the matter differently.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).  A district court must affirm a magistrate judge's decision unless "'on the entire evidence[, the district court] is left with the definite and firm conviction that a mistake has been committed.'"  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Plaintiff objects to the magistrate judge's order staying discovery until the resolution of defendants' summary judgment motions.  *See* Docket No. 116 at 1-3.  The Court has now resolved these motions.  In light of the Court's ruling on defendants' motions, plaintiff's request for relief is moot.

## IV.  CONCLUSION

Accordingly, it is

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Third Claim for Relief Relating to the Toilet Water Incident [Docket No. 66] is **GRANTED**.  It is further

**ORDERED** that plaintiff's Motion for Leave to Submit Surreply in Opposition to Defendants' Motion for Summary Judgment [Docket No. 135] is **GRANTED**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Third and Fourth Claims for Relief [Docket No. 67] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion for Limited Discovery Regarding the Toilet Water Incident Pursuant to Fed. R. Civ. P. 56(d) [Docket No. 90] is **DENIED**.  It is further

**ORDERED** that plaintiff's Motion for Limited Discovery to Respond to Defendants' Second Motion for Summary Judgment [Docket No. 124] is **DENIED**.  It is further

**ORDERED** that Plaintiff's Objection to the Court-Ordered Stay of Discovery [Docket No. 116] is **DENIED** as moot.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.

DATED March 19, 2013.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge